## STEPHEN H. PAULMIER

*v.*

## CORNELIA S. HOWLAND.

Specific performance will not be decreed where the title, which the complainant has agreed to convey, depends for its validity upon information which is not fully presented to the court, and upon the doubtful construction of the limitations of a deed and the terms of a statute, each of which is not only peculiar, but is also inartificially drawn.

On bill for specific performance, answer, replication and proofs.

*Mr. Theodore Little,* for the complainant.

*Mr. Joseph F. Randolph,* for the defendant.

THE CHANCELLOR.

The complainant seeks a decree that the defendant specifically perform a written contract, by which she agreed to purchase, from him, a lot of land on Franklin street, in Morristown, fifty feet wide and two hundred and twenty feet deep, for the price of $8,000.

The bill charges that the defendant refuses to perform the contract, because the complainant cannot, as she claims, make her a good title to the land, and it proceeds at this point in the following language—

" which allegation your orator denies, and alleges that he can make and could, at the time said deed was tendered as aforesaid, have made to the defendant a good title to said premises."

The answer and proofs more fully disclose the objection to the title offered.

Francis Childs, being seized in fee of the land in question, on the 10th of July, 1845, with his wife, in consideration of $150, did, by deed, grant, bargain and sell the property to Matthew G.

Lindsley, David Cockran, Samuel Bailey and Ezekiel Day,. "trustees of School District No. 17 of the township of Morris," and "to their successors in office forever."

"To have and to hold the same unto" [using the language of the deed] "the said parties of the second part and their successors in office forever, upon the special trust and confidence and for no other purpose whatever, that is to say, the said parties of the second part, and their successors in office shall and will, forever henceforth, permit the inhabitants of the township of Morris aforesaid, to occupy the said land hereinbefore granted as one of the public district school-house lots of said township, according to the laws of this state, passed for the establishment of common schools, or that may hereafter be passed upon that subject."

The deed contains several covenants with the grantees and their "successors in office," including warranty "unto the said parties of the second part, their successors in office in trust and confidence as aforesaid."

School District No. 17 was unincorporated. After the date of the deed referred to, the land was occupied by a public school-house, remaining in such occupation at least, as counsel admit,. until the date of the deed of it to John Bates, hereinafter mentioned.

By legislative enactment, approved on the 16th of March, 1854, entitled "An act for the relief of School Districts Nos. 12, 13, 17 and 18, in the township of Morris, in the county of Morris" (*P. L. of 1854 p. 373*), it was recited that the four school districts named had been consolidated into a single district, which single district contemplated the erection of a large and expensive building for educational purposes within its limits, and that it was deemed essential to the success of the enterprise that the school district should have power to elect more trustees than were permitted to a school district by the act entitled "An act to establish public schools," approved April 17th, 1846 (*P. L. of 1846 p. 164*), and enacted that it should be lawful for the taxable inhabitants, when assembled in accordance with the provisions of the last-named statute and the supplements thereto, to elect nine trustees, and that as soon as the district should elect

its trustees and become incorporated in pursuance of the laws of the state—

"the title" [continuing in the words of the statute] "to all property now owned by the said several districts hereinbefore named, or any of them, or which may be held by any of said districts for school purposes, under any deed or deeds of conveyance made to such district or districts, or to any persons as trustees of such district or districts, in whatever name said district or trustees may be described in such deed or deeds; and whether such district or districts have been incorporated or not, shall at once vest, and the same is hereby declared to vest, in the trustees of said new district, who shall have full power to sell the said property at public or private sale, and make all necessary conveyances therefor, and appropriate the proceeds of such sale towards the erection of a suitable building for educational purposes within said new district; and such conveyance or conveyances shall vest in the purchaser or purchasers the same title which the original deed to such district or its trustees was intended to convey to them."

The consolidated school district embraced parts of Hanover and Morris townships, in Morris county, but did not embrace the whole of Morris township.

On the 8th of April, 1854, in pursuance of the provisions of the ninth section of the supplement to the act entitled "An act to establish public schools," *supra,* which was approved March 14th, 1851 (*P. L. of 1851 p. 267*), and was the first general statute of this state which permitted the incorporation of trustees of school districts, the nine gentlemen who had been elected trustees of the consolidated district, together with the town superintendents of the townships of Morris and Hanover, parts of both those townships, as stated, being embraced in the district, became incorporated under the name, "The Morris School District," and they took possession of the property in question and continued to use it as a school-house lot.

On the 15th of November, 1869, more than fifteen years later, "The Morris School District," claiming to act under authority conferred by the act of 1854 above recited, in consideration of $1,800 executed a deed of the land in question, without covenants, to John Bates, who, with his wife, on December 20th, 1873, deeded the same property, with other lands, to the complainant, their deed containing a covenant of warranty.

It is to be observed that the deed from Childs was to four individuals as trustees of an unincorporated school district, and to their successors in office, not to them and their heirs; and that the inhabitants of the township of Morris were designated as the *cestuis que trust*, and their enjoyment of the use was to be " forever," but that the word " heirs " was not used in bestowing such use.

The recipients of the benefit intended were to be the inhabitants of a municipality " forever henceforth," an uncertain, fluctuating population, constituting the public of the locality. The benefit was a public charity. *2 Perry Trusts* § *700*. The elements of indefiniteness and uncertainty, as to the individual beneficiaries and the public character of the benefit, exhibit necessary constituents in the creation of a charitable use. *Newark v. Stockton, 17 Stew. Eq. 179*. The use was not intended to die within lives in being, but was to remain in perpetuity. But notwithstanding this evident design of the grantors, the absence of the word " heirs," both in the grant of the legal estate and the limitation of the use, restricts the estate conveyed to one for life (*Melick v. Pidcock, 17 Stew. Eq. 525, 541*), unless it can be said that the corporate township of Morris was the *cestui que trust*.

It is suggested, as the proper view of this trust, that the use was intended to go to the corporate township of Morris. The name of that corporation then was " The Inhabitants of the Township of Morris, in the County of Morris." *Rev. p. 1192* § 11. The trust was for the inhabitants of the township of Morris, and contemplated that the land should be occupied " as one of the public school-house lots of said township."

In the case of *Stearns v. Palmer, 10 Metc. 32*, it appeared that one Aaron Wearriner, in consideration of thirteen and one-tenth shillings, granted land to three individuals " in trust to and for the use of the inhabitants of the First Parish of Springfield, for a burying-ground forever, * * * to have and to hold said lands and premises to them * * * in trust to and for the use of the inhabitants of said First Parish and their heirs forever, for a burying-ground."

· The case arose in an action of trespass for breaking &c., the plaintiff holding a deed from the parish.

There, to the objection that the trust created was for the use of the individual inhabitants of the parish and not for the use of the parish in its corporate capacity, the court said : " But such a construction would be manifestly inconsistent with the purpose for which the conveyance was made, as it would limit the use to the inhabitants of the parish for the time being, and would exclude from the benefit of the trust all inhabitants of the parish who should become such subsequently to the conveyance, which certainly never could have been the object of the trust."

If this suggestion be correct, and the corporate township of Morris was the *cestui que trust*, the use to it is equivalent to a use in fee, for the corporation has unlimited life. *Ang. & A. Corp.* § *172; 2 Bl. Com. 109; Union Canal Co.* v. *Young, 1 Whart. 425; Overseers* v. *Sears, 22 Pick. 122; Chancellor* v. *Bell, 18 Stew. Eq. 538.*

' But if the use was granted to the corporate township, I am not prepared to say that the statute (*Rev. p. 165 § 66*) acted upon it and converted it into a legal estate. *Melick* v. *Pidcock, 17 Stew. Eq. 542.*

The terms of the trust, it is true, require the trustees to passively permit occupation of the land, but that occupation is to be of a prescribed character. If it were not for this restriction in the character of the use, I would have little hesitation in reaching the conclusion that the trustees were charged with no active duty. But not only is the character of the use prescribed, but it is expressly provided that it shall be "*for no other purpose whatever.*" The restriction of the use imports a possible necessity for action by the trustees in its enforcement, and to that extent prescribes an active trust.

This was the situation of the trust when the legislative act of 1854, *supra*, recognized a large consolidated school district, and provided that all the property of its component parts, the four small districts, should vest in its trustees, when they should become incorporated, and that those trustees, in their corporate capacity, should possess power to sell the same.

It is to be noted that this statute not only makes general mention of the property of the several parts of the district, but specifies, as though reaching towards the property here in question, land "held by any of said districts for school purposes under deed" to the district, or to persons as trustees for the district, and that it provides that the conveyance by "the trustees of the consolidated district shall vest in the purchaser the same title which the original deed to such district or its trustees was intended to convey to them."

This statute, taken literally and applied to the case in hand, appears to be designed to substitute trustees, and to permit those substituted trustees to part with the legal title. They are to give to the purchaser merely the title which the deed from Childs gave to the trustees of School District No. 17—that is, the land in trust, to permit it to be used by the inhabitants of the township of Morris for a public school, and for no other purpose.

But the statute contains a proviso that the proceeds of the sale shall be devoted to the erection of a building for educational purposes within the new consolidated district. This provision conveys the idea that substantial value is to be had for the property. That such value cannot be had for the mere legal title is patent. The legislature must have had in contemplation the sale of more than the naked legal title.

Did it contemplate a destruction of the trust?

It has not been made to appear that the land in question was purchased with public funds. The proofs do not disclose the source from which the payment for it came, and the recitals of the deed do not assist in an inquiry upon this subject. They are—

"In consideration of the sum of one hundred and fifty dollars * * * to them in hand well and truly paid and before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged and the said parties of the first part therewith fully satisfied and contented and paid."

There is no recital that the consideration came from the public, or from the grantees, and I am not prepared to say that any presumption arises, from the character of the grantees, that the con-

sideration was paid from public funds. If it were otherwise procured it could not be changed or destroyed by legislative act, for though the township might be nominal *cestui que trust*, its inhabitants were the real beneficiaries of the trust, with equitable rights entitled to protection. If, in such case, by reason of changed circumstances, it was fitting to alter the condition of the trust property, application should have been made to a court of equity and not to the legislature. *Newark* v. *Stockton, 17 Stew. Eq. 191.* It is perceived that the legislative act does not proceed upon equitable principles, for if it contemplates a conveyance free from the trust it takes the use from the whole body of the inhabitants of the township, and, by putting it into the school-house of a district which does not comprehend the entire township and includes a portion of another township having no interest in the trust, it deprives a portion of the inhabitants of the township of the benefit secured to them by the trust, providing no equivalent or compensation for their loss.

But, if it be considered that the fee is in the township by action of the statute upon a mere passive trust, what is the situation? The legislative act did not, in express terms, authorize the sale of township property; it authorized a sale of property held by any of the small districts for school purposes, under any deed or deeds of conveyance to such district, or to persons as its trustees. Did such language authorize a body foreign to the township to convey its property? This interrogation presents a question of statutory construction by no means free from difficulty. When the deed to Bates was made, the title presented four 'questions: Whether a charitable use for the lives of the trustees named in the conveyance from Childs and the then inhabitants of the township was created? Whether an active trust in fee was created? Whether the use in fee was converted into a legal estate in the township? and whether the deed to Bates, under the statute, passed more than an estate in trust for the original purposes declared in the deed from Childs? And it is to be noted that if the first question is answered in the affirmative, and only a life estate was created, the heirs at law of Francis Childs will take the remainder when the life estate

·expires; and if an active trust was created for a charitable use in fee, that the attorney-general may intervene to protect it; and if the corporate township took a fee, that it may question the legality of the legislative appropriation of its property.

The conveyance to Bates was in 1869—twenty-two years before the filing of this bill and fifteen years after the trustees of the consolidated district took possession of the property under authority of the act of 1854. Until the deed to Bates, the property was occupied as a school-house lot, in accordance with the provisions of the original trust. The proofs are silent as to the character of the occupation since that time.

It is insisted that the complainant either has title by adverse possession or will be protected in possession of the property by a court of equity, because of the acquiescence of those who might have disputed his title, in his and his grantor's expenditures in their purchases of the land and their acts of ownership over it.

The difficulty I experience at this point is, that the manner in which the complainant and his grantor have held possession has not been proved; nor has it been shown to what extent acquiescence has gone. If the land was granted for charitable use, can there be an acquiescence or an adverse possession which will destroy it?

If a life estate was granted by Francis Childs, the proofs do not show that it has terminated, but they do exhibit that Mr. Childs died in 1858, leaving children, and that in 1869 there were infants and *femes covert* among his heirs at law, who have emerged from disability within the last twenty years.

There are so many perplexing questions presented in this case, which threaten the complainant's title to this property and depend for solution, not only upon proofs that are not before me, but also upon the construction which is to be given to the limitations in the deed from Childs and the terms of the legislative act of 1854, both of which appear to be badly expressed and inartificial instruments, that, in the exercise of the discretion allowed me in this form of action, I feel constrained to deny the prayer of the bill. In doing so, I intend that it shall be distinctly understood that I do not affirm invalidity of the title.

Paulmier *v.* Howland.

I simply recognize that the title is burdened with difficult and unsettled questions, which rise above mere speculation, theory and possibility, and so stand in the way of a free alienation of the land that the land should not be forced upon the defendant. It is to be remembered that the judgment in this case is *in personam* and not *in rem,* and that the decree I may make for the complainant will not settle the questions suggested as to those who are not parties to this suit.

It is urged that it is clear that the heirs of Childs have no interest, and that the only parties who may possibly question the title are the attorney-general, in case there be a charitable use; and the township of Morris, if the fee vested in it, and that, as the proceeds of the sale to Bates have been devoted to the use that was contemplated in the deed from Childs, there is no reasonable probability that either of those parties will intervene. I cannot yield to this suggestion. I think danger of question from one or the other of these sources is to be apprehended, from the fact that the original grant was to the inhabitants of the township of Morris, while those who presently enjoy the proceeds of sale of the property are the inhabitants of a district which, while it does not include the whole of Morris township, extends its limits and benefits into another township. It can hardly be said to be improbable that some day the excluded inhabitants of Morris township may insist upon a solution of the unsettled questions.

It is said in *Fry Spec. Perf.* § *862 :*

"Though every title must in itself be either good or bad, there must be many titles which the court cannot pronounce with certainty to belong to either of these categories in the absence of the parties interested in supporting both alternatives, and without having heard the evidence they might have to produce, and the arguments they might be able to urge; and it is in the absence of these parties that the question is generally agitated in proceedings for specific performance. The court, when fully informed, must know whether a title be good or bad; when partially informed, it often may and ought to doubt."

The decisions in our own state accord with my conclusion. *Johnson* v. *Hubbell, 2 Stockt. 332, 334; Dobbs* v. *Norcross, 9 C.*

*E. Gr. 327; Tillotson* v. *Gesner, 6 Stew. Eq. 313; Cornell* v. *Andrews, 8 Stew. Eq. 7; S. C. on appeal, 9 Stew. Eq. 321,* and the cases cited by them.

I would reach my conclusion with greater reluctance if the complainant is in quiet possession of the land, so that he cannot test his title by ejectment, were it not for the act to compel the determination of claims to real estate and quiet the title to the same (*Rev. p. 1189*), which affords him the means to set at rest the doubts which induce the result I reach.

The bill will be dismissed, with costs.