HELEN M. BARGER

*v.*

JOHN GERY.

[Filed November 10th, 1902.]

1. A title dependent on a fact must be regarded as marketable where (1) the fact is so conclusively proved in a suit by the vendor for specific performance that a verdict against the existence of the fact would not be allowed to stand in a court of law, and (2) where there is no reasonable ground for apprehending that the same fact cannot be in like manner proved, if necessary, at any time thereafter for the protection of the purchaser.

2. A mortgagee assigned its mortgage to a third party, who assigned to another, who reassigned to the mortgagee. All of these assignments were duly recorded. Thereafter the mortgagee assigned to A., this assignment also being of record. No record of any kind appeared of any assignment by A. Thereafter the original mortgagee assigned to M. who assigned to another party, who brought a foreclosure suit in which he produced the bond and mortgage and obtained a decree thereon for a sale of the mortgaged premises. A. was not a party to this foreclosure suit. M. purchased at the foreclosure sale.—*Held*, in a suit for specific performance of a contract to purchase the land brought twenty-three years thereafter by a party claiming under M., that there was a presumption in favor of the validity of the offered title until some evidence was produced to the contrary that if A. took any rights by the assignment, such rights by reason of a transfer or otherwise were no longer enforceable against the offered title.

3. In a suit to compel the specific performance of a contract to purchase land, the evidence examined, and *held* to sufficiently show that an outstanding interest in the land in a third party had been lost by estoppel or by limitations, &c., to warrant a decree for complainant.

4. In a suit to compel the specific performance of a contract to purchase land, when the court found the title to be marketable, but the evidence in support thereof was not presented by the vendor to the vendee, a very important part of it being obtained by the vendor after the suit was commenced, costs ought not to be allowed to either party.

On bill for specific performance of contract for sale of land. Heard on bill, answer and proofs.

The bill is filed by the vendor to compel the vendee to perform his contract. The vendee defends on the ground that the title offered is not marketable. The title in dispute is traced back, through various conveyances which are not questioned, to a sheriff's deed in a foreclosure suit made in 1877, twenty-three years before the contract was made which is sought to be specifically enforced in this suit. The alleged defect in the title may be described briefly as this: That the mortgage foreclosed in the above-mentioned suit may, notwithstanding such foreclosure, be an outstanding encumbrance, enforceable on behalf of one John I. Anderson, who was not a party to the foreclosure suit, or by some person claiming through him. In other words, it is claimed that the party complainant who foreclosed the mortgage apparently did not own it; that his title to it was through an assignment from a former owner, who had previously assigned it to one John I. Anderson, by a valid deed of assignment, which was on record at the time of the second assignment, under which the complainant in the foreclosure suit held title.

The complainant contends that, under all the circumstances, the possibility of there being any enforceable claim under the mortgage on behalf of Anderson, or anyone deriving title from him, is too remote for consideration; that there is no room for reasonable apprehension that any claim under the supposed Anderson assignment will ever be made.

The facts, in which dates are of great importance, are as follows: The bond and mortgage were made by Archibald Warren to the New Jersey Mutual Life Insurance Company; they bear date February 18th, 1873, and the mortgage was recorded February 24th, 1873, in the Passaic county clerk's office. The debt secured was $2,600, and it was payable May 1st, 1874, with interest. The property consisted of a plot one hundred feet square, containing four city lots, in the outskirts of the city of Paterson, on which a house, apparently a substantial residence, was erected. The house and two lots, making a plot fifty by one hundred feet, is the subject-matter of the contract in this case, and the contract price is $1,250.

On March 25th, 1873, the New Jersey Mutual Life Insurance Company assigned the bond and mortgage to one Daniel J.

Noyes, and on the same day Daniel J. Noyes assigned the mortgage to Kate C. Woolsey, and on May 29th, 1873, Kate C. Woolsey assigned the mortgage back to the New Jersey Mutual Life Insurance Company. All of these assignments were duly recorded.

According to the records of the Passaic county clerk's office, on September 7th, 1874, the New Jersey Mutual Life Insurance Company assigned the bond and mortgage to one John I. Anderson, the assignment being recorded December 28th, 1875. The arguments of counsel assume that there is no record of any kind of any assignment of the bond and mortgage by John I. Anderson.

On January 24th, 1877, the New Jersey Mutual Life Insurance Company executed a deed of assignment, bearing that date, purporting to transfer the bond and mortgage to one Minot Mitchel, of Yonkers, Westchester county, in the State of New York, which deed of assignment was duly recorded January 31st, 1877. Subsequently Minot Mitchel assigned the bond and mortgage to one Alexander Phillip, who thereupon, on May 31st, 1877, filed a bill in the court of chancery to foreclose the said mortgage. This foreclosure bill is in the usual form, setting forth the execution of the mortgage by Archibald Warren to the New Jersey Mutual Life Insurance Company, the assignment thereof by the insurance company to Minot Mitchel, above mentioned, and the assignment thereof from Minot Mitchel to the complainant, Alexander Phillip, but ignoring altogether the assignments of the bond and mortgage prior to the assignment to Minot Mitchel, including the supposed prior assignment to John I. Anderson. The solicitors who filed this foreclosure bill were Messrs. Lynn & Babbitt, of Jersey City. The suit was prosecuted in the usual way, and no exception is taken to any of the proceedings therein. The bond and mortgage, the assignment from the insurance company to Minot Mitchel and the assignment from Minot Mitchel to the complainant, Alexander Phillip, were all produced before the master and marked as exhibits in the cause. The master, now deceased, reported the amount due on the bond and mortgage as $3,393.71 and $1,581.65 due upon a subsequent judgment. Final decree and execution followed, and the sheriff of

Passaic county, to whom the execution was issued, conveyed the mortgaged premises to the said Minot Mitchel, by deed dated December 8th, 1877. Whether the assignment from Minot Mitchel to Alexander Phillip, the complainant in the foreclosure suit, was or was not recorded, is not material, because Minot Mitchel became the purchaser, and the title of Mrs. Barger, the complainant in this cause, is derived from him, and therefore includes the entire title to the mortgage, if any, which Minot Mitchel took from the New Jersey Mutual Life Insurance Company by his assignment, together with the title of Warren, who held the equity of redemption and the title of the subsequent encumbrancers. Mrs. Barger apparently holds a good title to the premises described in the contract before the court, unless someone in existence at the present day can enforce this mortgage against the property under title thereto derived in some way from John I. Anderson.

The defendant alleges in his answer that after the execution of the contract in question he was advised by counsel of a contemplated mortgagor that the title was defective and not marketable, but no proof was offered of this allegation. Any such opinion of counsel was presumably based upon the record only. After the bill was filed in this cause the solicitor for the complainant herein procured the bond and mortgage in question from the executor of the late Mr. Lynn, of Lynn & Babbitt, who found them among his testator's papers. The bond and mortgage, with the assignment from the insurance company to Minot Mitchel as well, were offered in evidence in this cause. These papers all bear the endorsement of the master of chancery, in the usual form, showing that they were exhibits in the foreclosure suit of Alexander Phillip against Archibald Warren and others, above mentioned.

The New Jersey Mutual Life Insurance Company was located at Newark, in this state, and has been defunct for about twenty years.

The immediate grantee of Minot Mitchel was Augustus H. Drury, a practicing lawyer of Paterson, who took title from Mr. Mitchel by warranty deed dated November, 1877. Mr. Drury was sworn as a witness on behalf of complainant, and testified

that he was acquainted with both Minot Mitchel and John I. Anderson, and that these men have been dead for several years; that the house upon the property was built by Mr. Warren, and the whole property was formerly worth about $4,000, but that it was not worth that much at the present time; that John I. Anderson and Minot Mitchel were "business associates, and had a good deal of business with each other," and belonged to a set of "lawyers and real estate people" who were doing business together in New York. The witness further testified that John I. Anderson knew of the foreclosure suit of Mr. Phillip, and that the foreclosure suit "was in the interest of Mr. Minot Mitchel," and that Anderson also knew of the conveyance by Minot Mitchel to the witness ten years later. These statements were undisputed, the witness not even being cross-examined in regard to them. The witness testified, also, that during the time he owned the premises no demand was ever made for interest on the mortgage by anyone. The witness owned the premises from November, 1887, to January, 1900.

It is admitted that Minot Mitchel, the purchaser at the sheriff's sale in 1877, and his grantees and assigns, including the complainant, have been in possession of the premises ever since the sheriff's sale. The complainant took title January 2d, 1900.

The defendant offered no evidence, except an abstract of title of the premises, which was admitted by consent of complainant, and which exhibits the deeds, mortgages and assignments mentioned above.

*Mr. James H. Rogers,* for the complainant.

*Mr. Daniel L. Campbell,* for the defendant.

STEVENSON, V. C.

No exact definition has been, or probably can be, formulated of either a marketable or an unmarketable title. Various descriptions have been attempted. Professor Pomeroy lays down the law as follows:

"A specific performance will never be decreed at the suit of the vendor whenever the doubt concerning his title is one which can only be settled by

a further litigation, or when the court can see that the purchaser will, with reasonable probability, be exposed to *bona fide* adverse claims on the part of third persons, and to the risk of litigation for the purpose of removing such claims." *Pom. Spec. Perf.* § 203.

Chancellor Runyon, in *Dobbs* v. *Norcross, 9 C. E. Gr. 327, 331,* and the court of errors and appeals, in *Tillotson* v. *Gesner, 6 Stew. Eq. 313, 327,* adopted the language of Professor Parsons, as follows:

"The purchaser should have a title which should enable him not only to hold his land but to hold it in peace; and if he wishes to sell it to be reasonably sure that no flaw or doubt will come up to disturb its marketable value."

In all cases where the vendor seeks to force a title upon the vendee, it is the latter's position, not at the commencement of the suit, but at its termination, which is to be regarded. The question is, not what kind of a title the vendor has, but what kind of a title the vendee will get if the court of chancery, or the court of errors and appeals, after reviewing the decree of the court of chancery, forces the offered title upon him.

Where the alleged doubt in regard to the offered title relates to a matter of law, a decision of the court in the suit for specific performance, undertaking to establish what the law is, must, of necessity, have some effect either to strengthen or dispel the doubt. How far the court will undertake to settle a disputed question of law out of which the doubt in regard to the title has arisen, has been the subject of a variance of judicial opinion, although the general trend has been toward enlarging the jurisdiction of the court of equity in dealing with the doubtful matter of law. *Fry Spec. Perf. (3d Am. ed.)* §§ *865, 868; Pom. Spec. Perf.* § *202.* The cases on this subject are discussed at length in the opinion of Vice-Chancellor Emery in *Lippincott* v. *Wikoff, 9 Dick. Ch. Rep. 108,* and a rule on the subject is therein indicated (at *p. 120*).

In *Fahy* v. *Cavanagh, 14 Dick. Ch. Rep. 278, 282, 283,* Vice-Chancellor Pitney expresses himself in favor of a broader rule.

But whatever curative power upon a doubtful title the court of chancery, or the court of errors and appeals, on appeal from

the court of chancery, can exercise in a suit for specific perform-
ance, where the doubt relates to some general rule of law, or the
construction of some form of language employed in a writing,
practically very little, if any, such curative power can be exer-
cised where the doubt relates to a mere fact. The reason is
apparent. A disputed fact may be proved in one litigation
to-day and be disproved in another litigation between different
parties to-morrow. The evidence which clearly establishes a fact
at one time may be wholly beyond reach a year or five years
later.

In *Tillotson* v. *Gesner, supra,* the defect in the title, from
which danger to the purchaser was apprehended, was a judgment
recovered against a former owner, who had, immediately before
its recovery, conveyed the land by a deed, the *bona fides* of which
was open to doubt.

In *Fahy* v. *Cavanagh, supra,* the title rested upon a will, ap-
parently witnessed by two persons, but without any attestation
clause reciting the facts showing compliance with our statute
of wills. Vice-Chancellor Pitney found that the will had been
lawfully executed, but refused to force the title upon the pur-
chaser, because he might, years after, be utterly unable to prove
the will in an action of ejectment brought by the heirs of the
testator.

That titles must be held marketable, although dependent on
the proofs of facts, cannot be disputed. If this were not so, a
vendor holding title as heir or devisee, in a large number of
cases, could not have the remedy of specific performance. But
when we come to inquire for rules as to the nature and *quantum*
of evidence necessary to render a title dependent on facts, which
must be proved by witnesses, a marketable title, we find our-
selves with comparatively little help from the decided cases. It
must be true, from the nature of things, that every case must
largely rest upon its own circumstances. We have the general
rule that the purchaser has a right to a title which is reasonably
safe—reasonably safe against loss and reasonably safe against
attack. When the authorities speak of the hazard of litigation
to which the purchaser must not be subjected, it seems to me
that they must refer to a hazard which is to be determined by

the chance of successful attack as viewed by the court in the suit for specific performance. When, also, they speak of a doubt or a supposed flaw as affecting the salability of a title, they must refer to the character of the doubt or flaw as the court views it, and not as it may be viewed by the indeterminate judgment of the real estate market. Some purchasers, guided by cautious counsel, will not accept a title against which the slightest possibility of doubt is suggested; and yet there is no title concerning which a possible doubt or the possibility of a future flaw cannot be raised.

The authorities, I think, establish the rule as a safe one that a title dependent on a fact must be regarded as marketable when (1) the fact is so conclusively proved in the suit for specific performance that a verdict against the existence of the fact would not be allowed to stand in a court of law, and (2) where there is no reasonable ground for apprehending that the same fact cannot be, in like manner, proved, if necessary, at any time thereafter for the protection of the purchaser.

In *Shriver* v. *Shriver, 86 N. Y. 575, 584,* Chief-Justice Folger says: "A title may be doubtful—which is to say, unmarketable—because of the uncertainty of some matter of fact appearing in the course of the deduction of it, and if, after the vendor has produced all the proofs that he can, a rational doubt still remains, a title is not marketable. It seems that a rational doubt may be said to exist when a court of law would not feel called upon to instruct a jury to find that the fact existed on the existence of which the vendor's title depends." See *Hellreigel* v. *Manning, 97 N. Y. 56, 60; Moser* v. *Cochrane, 107 N. Y. 35; Ferry* v. *Sampson, 112 N. Y. 415.*

In *Ferry* v. *Sampson, supra,* the New York court of appeals declared that "if the existence of the alleged fact which is supposed to cloud the title is a possibility merely, or the alleged outstanding right is a very improbable and remote contingency, which, according to the ordinary experience, has no probable basis, the court may compel the purchaser in such a case to complete his title."

In *Vought* v. *Williams, 120 N. Y. 253, 258,* the above-quoted

statement was repeated by the same court, although held inapplicable to the case then before the court.

The English rule, stated by Professor Pomeroy (*Pom. Spec. Perf.* § *205*), takes special account of any presumption favorable to the title, and apparently takes no account of the availability of the evidence produced in favor of the title for the future protection of the purchaser in a subsequent litigation between the purchaser and a third party—thus ignoring the class of cases to which *Fahy* v. *Cavanagh, supra,* belongs.

Coming, now, to the consideration of the case before the court, my conclusion is that, whatever may be the exact definition of a marketable title, which is dependent on the proof of facts, if such a definition can safely be framed, this title is proved in this case to be a marketable one. It is conclusively proven, in my opinion, that the alleged mortgage held by John I. Anderson cannot be enforced against this purchaser, the defendant, and that there is no reasonable basis for any apprehension that the purchaser cannot, at all times, defend his title against this mortgage, or that any future intending purchaser should, as a reasonably prudent man, hesitate to accept the title which this defendant, the present purchaser, will be able to offer to him.

The sole fact which is set up against the merger of the mortgage in the foreclosure decree is that apparently John I. Anderson owned the mortgage in 1875. No proof is offered that Anderson did not transfer the mortgage back to the New Jersey Mutual Life Insurance Company. Before the Anderson assignment was made the mortgage had already been transferred by this company, and, after changing hands several times, had been transferred back to the insurance company. After the Anderson assignment was made the bond and mortgage were in the possession of the insurance company, or of their later assignees, with an open claim of ownership. The complainant (Phillip) in the foreclosure suit produced the bond and mortgage, and he was adjudged to be the owner of it in the foreclosure suit. A bond and mortgage are assignable by delivery. Possession of a bond and mortgage, with claim of ownership, would seem to carry as strong a presumption of title as does possession of a chattel. The assignment of Anderson is not at all inconsistent with a

subsequent ownership of the bond and mortgage by the insurance company and by Mitchel and Phillip.

It has never been the custom in New Jersey to make all the former holders of encumbrances parties to a foreclosure suit in order to prevent all future question as to their having parted with their titles. The protection of titles derived from foreclosure sales may call for a wider rule than any which I shall apply in this case; but it seems to me that where a bond and mortgage are produced by a complainant or a defendant in a foreclosure suit, and he is therein adjudged to be the owner thereof, public policy justifies a strong presumption that he was such owner, in favor of a purchaser at the foreclosure sale, and against a vendee from him, who merely proves that someone else owned the mortgage prior to the time when the party to the foreclosure suit acquired the title to the mortgage which was accepted in such suit. The burden in such case should, in my judgment, be placed, not upon the purchaser to prove that the former owner transferred his title, but upon his adversary to present some evidence that the former owner did not transfer his title or that some person can assert a title under him.

I think, therefore, that in this case we start with a strong presumption in favor of the complainant, and against the existence of any valid title to this mortgage outstanding at the present day and held under the Anderson assignment.

But, aside from all presumptions, let us examine the evidence on the two questions:

*First.* Whether John I. Anderson parted with his title or estopped himself to set it up, and

*Second.* Whether, without regard to any possible transfer from Anderson back to his assignor, the mortgage is enforceable at the present time under the statute of limitations. In discussing both questions, especially the first, we must regard, not only the evidence, but the probability of its availability for the protection of the defendant in the future.

1. The mortgage was due in 1874, twenty-six years before the contract was made by these parties. There is no evidence, apart from the assignment to Anderson, that he ever had the mortgage in his possession, nor is there any evidence that he ever collected

any part of the principal or interest secured by it.  He was con-
nected in business with Minot Mitchel, and knew of the fore-
closure suit, and also knew of the purchase of the property by
Mr. Drury, ten years after the foreclosure sale to Mitchel had
taken place.  The bond and mortgage remained apparently for
over twenty-three years in the custody of the lawyer who con-
ducted the foreclosure suit, or of his executor—remained as dead
and worthless papers—until the solicitor for the complainant in
this suit had them looked up and produced.  The property was
improved, rentable property, and has been occupied continuously,
by a series of owners, under title derived from the foreclosure
sale, for these twenty-three years before the contract between the
parties to this suit was made.  The inference is unavoidable that
no attempt was made by Anderson, or anyone claiming under
him, to enforce this mortgage, although Anderson was alive for
at least ten years after the foreclosure sale.  Mr. Drury's testi-
mony strongly indicates that if Anderson had any title to this
mortgage at the time of the foreclosure sale, he estopped himself
to set it up, and also indicates that there are other witnesses
who can testify to the facts going to establish this estoppel.
Every year that goes by may make the proof of this estoppel,
if there was one, more difficult, but this same lapse of time
makes the probability of any attempt to assert the supposed
Anderson title to the mortgage more remote, and makes any
such assertion of title more hopeless.

If this mortgage was not merged in the foreclosure decree,
then we have a mortgage which was due twenty-eight years ago,
on which the defendant in this suit does not show that any
claim has ever been made since it was openly foreclosed, by a
party who had possession of it, about twenty-five years ago.
Inasmuch as the property in dispute has all these years been
rentable property, yielding an income, occupied by a succession
of owners, it would seem as if the defendant might have been
able to prove some assertion of the Anderson title—some recogni-
tion of it by payment of interest or otherwise—if proof of that
character could at any time be possibly obtained.  The posses-
sion of the bond and mortgage during all this period by the
solicitor who undertook to foreclose it, or his executor, is an

additional indication that the mortgage, in fact, was merged in the foreclosure decree, and that the possible or presumed former owner, Anderson, had lost what title to it he ever had.

Upon the facts stated, in my judgment, the defendant has no right to stand upon the mere existence of this record of an assignment to Anderson twenty-seven years ago, and the absence of any record of an assignment from Anderson; he is bound, whether a presumption is established against him by the foreclosure 'suit as indicated above or not, to bring some evidence to show that the Anderson title has life to-day. He is not bound to *establish* the Anderson title, but out of all the witnesses who plainly can be produced to give positive or negative testimony in relation to this property and its encumbrances, he should be able to find one spark of testimony in favor of his contention—in favor of the doubt which he claims inheres in the title.

2. Without regard to the question of the ownership of the mortgage, the evidence very strongly indicates that the statute of limitations is a complete bar to any attack upon this title based on the alleged existence of this mortgage as an encumbrance. The mortgage is twenty-eight years overdue. While the evidence of non-payment of interest is not as complete as might have been expected, no objection to the sufficiency of the proof on this subject was made at the argument, and no claim was made that the mortgage had been kept alive by any such payments. It seems almost incredible that interest could have been paid by the owners of this property on the mortgage upon the foreclosure of which their title depended, and which was lying, with its accompanying bond, among the old papers of the lawyers who conducted the foreclosure.

In *Ely* v. *Wilson, 16 Dick. Ch. Rep. 94, 104,* Vice-Chancellor Pitney holds "that a payment on account of the debt, in order to be efficient to preserve the mortgagee's right against lapse of time, must be made by the party in possession of, and claiming title to, the mortgaged premises."

Payment by the makers of the bond, Mr. and Mrs. Warren, would not keep the mortgage alive. If, during the past twenty years, or during twenty years preceding this contract, either of the three owners of this property paid interest upon the mort-

gage to any person, this unknown person, whose possible existence is held to create the fatal doubt in this case, apparently must have had notice of the foreclosure sale and of the title adverse to his mortgage which the occupants of the property held. It may be added that apparently the statute of limitations began to run against John I. Anderson at least when Minot Mitchel took possession of the property, twenty-five years ago.

In *Foreman* v. *Wolf, 29 Atl. Rep. 837,* the court of appeals of Maryland declares that in that state it was "well settled that a title by adverse possession for over twenty years, where the only persons who could claim were all under no disability, is marketable, and such as a court of equity will compel a purchaser to take."

*Kip* v. *Hirsh, 103 N. Y. 565,* is very similar in its essential facts to the one at bar. A mortgage upon certain vacant lots was made in 1835. In 1840 the mortgagor made a general assignment for the benefit of his creditors, which reserved to him any surplus. The assignment was recorded. The mortgage was foreclosed and the lots were sold in 1841. The assignee was not made a party. The lots were enclosed and leased in 1867, and were occupied thereafter. In 1875 the defendant contracted to purchase the lots, but refused to accept a deed, claiming that there was a defect of title, by reason of the omission to make the general assignee a party to the foreclosure suit. The court held that the "presumption of payment attaches to all the debts, and it can hardly be conceived that any facts can exist which would entitle any person to enforce the trust." The court therefore reversed the court below, and held that the defendant would acquire a good and marketable title.

A doubt which can avail to defeat the vendor's remedy of specific performance "must be reasonable, and, so far as it depends upon contingent events and uncertain facts, their occurrence or existence must be fairly probable." *Pom. Spec. Perf.* § *204.*

In my opinion no verdict of a jury in favor of the existence of any enforceable claim under the title to the mortgage in question alleged to have existed in John I. Anderson in 1875 would be allowed to stand. The proof before this court, composed of

presumptions, positive evidence on the part of complainant, and the absence of evidence on the part of defendant, appears to me to be conclusive in favor of the existence of the facts and conditions which are necessary to render the title which will be forced on the vendee in this case a marketable title.

As a general rule, it seems to me that any order for costs in a vendor's suit for specific performance must be made with regard to the *status* of the defendant (the vendee), not at the end of the suit, but at its commencement—at the time when he refused to take the offered title. Where the suit has exercised a curative effect upon the title, and the vendee was justified, under his contract, in demanding that such cure should be made, the expense of the suit may be a necessary incident to the performance of the contract by the vendor. Not only should the vendee not be mulcted in the costs of the vendor, but, in some cases, I think the payment of the entire costs and expenses of the vendee by the vendor should be a condition upon which the decree in favor of the latter should be made. The English rule, cited by Mr. Fry (*Fry Spec. Perf. (3d Am. ed.)* § *876*), and embodied in a *dictum* of Sir George Jessel, in *Osborne* v. *Rowlett, L. R. 13 Ch. Div. 774, 798 (1880),* to the effect that even if the vendee was justified in refusing the title until decree in its favor, still he should be ordered to pay the costs, "so as to assure his title and show that the court entertains no doubt upon it"—if there is such a rule—is, in my judgment, one not to be adopted by this court. Most vendees would prefer to accept the title forced upon them by suits, which they have properly required the vendor to bring, without this unsolicited and expensive "assurance" from the court.

In *Radford* v. *Willis, 7 Ch. App. 7, 11 (1871),* the action and declaration of the court in regard to costs are inconsistent with the above-cited supposed rule.

Where the dispute over the title is about a fact, ordinarily, as we have seen, the decree can have little curative power. The decree, in most, if not all, cases, establishes the marketability of the title which the vendor offered, not merely the marketability of the title which the vendee will take as the result of the suit for specific performance.

Nevertheless, the vendee, in all cases, is not under any obligation to search for evidence and produce the witnesses who can establish the title of the vendor. In this case the evidence to support the offered title was not presented by the vendor to the vendee; a very important part of it was obtained by the vendor after this suit was commenced.

Under the circumstances, which always control a decree in equity in regard to this matter, no costs will be allowed to either party.