WILLIAM SHEEHAN

*v.*

FRANK L. HUMPHREYS et al.

[Submitted January 25th, 1912. Decided April 3d, 1912.]

1. In specific performance suits this court is debarred from granting relief where there is doubt either concerning the facts or the law.

2. Evidence examined and *held* to create so much doubt about the matter that relief must be denied to the complainant.

On final hearing on bill, answer, replication and proofs.

*Mr. Charlton A. Reed* and *Mr. Elmer King,* for the complainant.

*Mr. Willard W. Cutler* and *Mr. Richard V. Lindabury,* for the defendants.

HOWELL, V. C.

The controversy in this case arises out of an alleged agreement between the complainant and Humphreys for the sale and

transfer of certain shares of the capital stock of the Morris and Somerset Electric Company. At the time the alleged bargain was made Humphreys owned eighty shares of the stock, thirty of which stood in his name on the books of the company; the other fifty stood in the name of the defendant Gillespie and had not been transferred on the books. Humphreys, however, held the certificate properly endorsed and was the real owner. In January of 1911 the complainant and Humphreys had some conversation respecting the sale of Humphreys' stock, but at that time there was no definite number of shares spoken of. It was, however, distinctly mentioned by Humphreys that he would not care to dispose of all his stock and that he would like to remain a member of the board of directors for the reason that he had been connected with the company since its organization. Plainly this early conversation contemplated that Humphreys should retain some portion of his stock.

The next step in the transaction was a letter written by the complainant to Humphreys under date of February 11th, 1911, in which the complainant asks the defendant Humphreys to procure options on the stock of his friends, without letting them know who was seeking the option, and enclosing copies of forms of option and proxy to be executed by the voting stockholders. He says:

"We would ask you in this case also to sign a copy of this [form of option] covering your own holdings, and we feel sure that several of your friends [naming them] would sign them if you requested them to do so. We leave the matter in your hands and trust that you can aid us in bringing the necessary conditions about to secure for us control of the maximum amount of stock among your friends * * * You must realize of course that we would like to secure options upon the stock at eighty-five, as you have offered yours for, but leave that entirely in your hands to say if you see fit to take this matter up for us then whether it shall be eighty-five or some other figure."

At the time this letter was written Humphreys was in Florida, and he did not receive it until he arrived home on February 21st. On that day he wrote a letter in reply to W. M. Sheehan & Company, the complainant's firm, in which, among other things, he said:

27

"I shall go ahead and see what I can do for you. While I am willing to sell my stock at the figure I gave you, I can give no positive assurance that anyone else will do so. I can hardly go to friends to whom I sold stock at par and ask them to sell at any figure much under par, but I will see what I can do and let you know."

There is very grave doubt in my mind about the meaning and effect of this correspondence. When the motion for an injunction was made I was of the opinion that it did not constitute an option which could be made a binding agreement by any acceptance thereof. Now having heard all the evidence and examined all the exhibits, the same doubt remains in my mind that I expressed on that occasion. It is very evident that the complainant, either individually or on behalf of a firm of brokers in New York, desired to secure the control of the company by the purchase of a majority of its stock. Neither he nor they cared particularly about the stock of Humphreys unless they could secure enough shares to give them control. Reading the correspondence with this in mind it is quite apparent that what the complainant was bargaining for was the control of the company, and this is what Humphreys was endeavoring to aid him in procuring. Again, there is doubt as to the number of shares which the defendant Humphreys intended to contribute to the complainant's scheme of control. The correspondence does not mention the number of shares. It refers to a previous conversation in which it was specifically stated that Humphreys should retain an interest and remain in the directorate. How can the court determine how many shares were in the contemplation of the parties at the time of the correspondence? The only statement on the subject appears in the January conversation, and that left it entirely indeterminate. This court is debarred from granting relief in specific performance cases where there is doubt concerning either the facts or the law. This has been determined by the court of last resort in a long line of cases. *McKibbin* v. *Brown, 14 N. J. Eq. (1 McCart.) 13; affirmed, 15 N. J. Eq. (2 McCart.) 498; Potter* v. *Hollister, 45 N. J. Eq. (18 Stew.) 508; affirmed, 46 N. J. Eq. (1 Dick.) 609; Myers* v. *Metzger, 63 N. J. Eq. (18 Dick.) 779; Doutney* v. *Lambie, 78 N. J. Eq. (8 Buch.) 277; Van Riper* v. *Wickersham, 77 N. J. Eq. (7 Buch.) 232.*

Again, it is not clear that the parties intended that the correspondence in question should operate either as an option or as a contract. The letter of February 11th enclosed several forms of option and proxy, one of which the complainant asked Humphreys to sign. This points to the conclusion that the complainant did not think that Humphreys would be bound unless he signed one of those documents; besides, from a careful examination of the form of so-called option, it is not entirely clear that it is not an agreement for the sale of shares *in præsenti* with payment and delivery postponed.

There is so much doubt about the matter that I am constrained to deny relief to the complainant. The bill must therefore be dismissed.