ROBERT H. McCARTER POTTER, respondent,

*v.*

JOHN LUMSDEN, appellant.

[Decided February 9th, 1922.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Fielder, who filed the following opinion:

"Complainant was the owner of land in Andover, in this state, upon which a brick dwelling, tenant-houses and several barns are erected, the whole being known as the 'Pequest Stud Farm,' which complainant had operated for several years for breeding horses. Defendant was seeking to purchase a stud farm and complainant opened negotiations with him for the sale of the land and premises in question. After several meetings between them, complainant agreed to sell and defendant agreed to buy the real property and certain work horses, farm implements, machinery and equipment for $40,000, of which defendant paid $10,000 on account and took the following receipt from complainant:

"'In consideration of ten thousand dollars ($10,000) to me in hand paid this day and for a further consideration of thirty thousand ($30,000 00/100) to be paid upon the surrender of a deed, I agree to sell and transfer to John Lumsden of Ottawa, Can., the tract of land known as the 'Pequest Stud,' same being situated in the township of Andover, on the road from Newton to Hackettstown between the settlement known as Brighton and the village of Andover, in the State of New Jersey, said tract containing 450 acres, more or less, together with all personal property on said tract with the exception of contents of brick house, tractor and plow and harrow, brood mares, stallions, foals, yearlings & 2 year olds & 'bow bells,' one mule & milk bottles.

"'Dated N. Y., April 26th, 1918.

                                        "'R. H. McCARTER POTTER.'

"On or about May 1st, 1918, defendant, with complainant's consent, entered into possession of the real and personal·prop-

erty and has held possession ever since. Complainant sought to
have defendant accept a deed for the property and pay the bal-
ance of the purchase price, but defendant refused and complain-
ant has filed his bill praying that defendant be compelled to per-
form his contract by accepting a deed for the farm and paying
complainant $30,000 with interest from May 1st, 1918. De-
fendant urges in defence of the suit that complainant has not
good title to a tract of seven and eighty-six hundredths acres
which forms a necessary part of the farm; that he agreed to buy
the farm for $40,000 upon complainant's representation that it
contained four hundred and fifty acres, when in fact it contains
less acreage, and that complainant made defendant no tender of
a proper deed before filing his bill of complaint.

"Dealing with the first objection raised by defendant, it is con-
ceded that complainant has no record title to the seven-and-
eighty-six-hundredths-acre tract. He depends upon open, no-
torious and exclusive possession of that tract in himself and his
predecessors in possession for more than fifty-five years, and he
contends that by recorded deeds to himself and his predecessors,
it was intended to convey the tract in question, but that by mis-
take the wrong description was inserted in the deed. It was
proved that Jonathan D. Calvin, who was seized of the tract,
conveyed it to Samuel Hibbler by deed dated June 23d, 1838,
recorded July 10th, 1838, and that the same grantor conveyed
to the same grantee by deed dated April 20th, 1839, recorded
July 8th, 1839, another tract of seven and twenty hundredths
acres in the same township; that Samuel Hibbler, being then
the owner of the two tracts, by deed dated April 1st, 1865, re-
corded May 2d, 1865, conveyed to his son James R. Hibbler,
describing in the deed the seven-and-twenty-hundredths-acre
tract; that the seven-and-twenty-hundredths-acre tract was
thereafter conveyed by James R. Hibbler, by deed dated April
1st, 1887, recorded April 5th, 1887, to his brother Thomas Hib-
bler, and by Thomas Hibbler, by deed dated March 28th, 1894,
recorded the same day, to John Emmans, and by John Emmans,
by deed dated March 31st, 1902, recorded April 21st, 1902, to
complainant. Complainant argues that in the deed from
Samuel Hibbler to James R. Hibbler the seven-and-twenty-

hundredths-acre tract was described by mistake instead of the seven-and-eighty-six-acre tract, and that this mistake was followed in the subsequent deeds down to and including the deed to complainant, and in support of his argument, and also in support of complainant's claim to adverse possession by himself and the preceding grantors, it was proved that actual possession of the seven-and-twenty-hundredths-acre tract remained in Samuel Hibbler from the time of his conveyance from Jonathan D. Calvin down to his death intestate, February, 1868, and that after his death that tract was included in and sold with other lands which comprised his farm and the proceeds of sale distributed among his heirs-at-law, and the seven-and-eighty-six-hundredths-acre tract, also conveyed by Calvin to Samuel Hibbler, was never conveyed by the latter or his heirs-at-law; that James R. Hibbler, to whom Samuel Hibbler conveyed the seven-and-twenty-hundredths-acre tract in 1865, took possession of the seven-and-eighty-six-hundredths-acre tract, cultivated it, set out fruit trees and erected a house and barn thereon and occupied that tract until he conveyed to Thomas Hibbler, in 1887, and that Thomas Hibbler, John Emmans and complainant, under their respective deeds, which described the seven-and-twenty-hundredths-acre tract, went into possession of the seven-and-eighty-six-hundredths-acre tract and continued in open, visible, notorious and exclusive possession, undisturbed and uninterrupted, such adverse possession being continuous from 1865, the possession of complainant having been since 1902.

"While complainant's argument that the deeds recited intended to describe the seven-and-eighty-six-hundredths-acre tract instead of the seven-and-twenty-hundredths-acre tract, has a reasonable foundation, I cannot determine in this suit that such mistake actually occurred, and I shall consider only the question of adverse possession. No evidence was offered on the part of the defendant to controvert, or even to cast doubt upon the accuracy or reliability of the evidence to show possession by complainant and his predecessors who claimed to own the seven-and-eighty-six-hundredths-acre tract since 1865, and I must therefore find that under *Comp. Stat. p. 3169* §§ *16, 17*, the right of any person claiming title adverse to complainant is barred, but, be-

fore holding that complainant's proof in this suit of title by adverse possession is a sufficient answer to defendant's refusal to take title, I should consider the principle laid down by this court that when the validity or marketability of title depends upon facts outside the public records, a vendee should not be forced to take the title unless the necessary proofs are available to him when he may have future need of them. A doubt as to validity of title which can avail to defeat the vendor's claim to specific performance must be reasonable, and, so far as it depends on contingent events and uncertain facts, their occurrence or existence must be fairly probable. There is clear and uncontroverted evidence in this case of more than fifty-five years of actual possession by complainant and those through whom he claims ownership, and I can see no reasonable apprehension that proof of possession and occupancy, similar to that presented in this case, will not be available to defendant as it was to complainant. Defendant may not be able to produce the same witnesses, but the statutes limiting actions for the possession of lands will continue to run, and the facts to show adverse possession for the necessary period will always be at hand. *Day* v. *Kingsland,* 57 *N. J. Eq. 134,* and *Barger* v. *Gery,* 64 *N. J. Eq. 263,* are cases similar to the instant case and in which this court decreed specific performance. I am, therefore, of the opinion that under the proofs before me, the defendant's refusal to perform his contract on the ground that complainant's title to the seven-and-eighty-six-hundredths-acre tract is not good and marketable, is not well founded.

"The second reason urged by defendant why he should not be required to perform his contract is, that in the negotiations leading up to the sale, complainant represented to him that the farm contained four hundred and fifty acres, whereas by survey its acreage is found to be less, and defendant further urges that if he should be decreed to specifically perform, he should be allowed an abatement on the purchase price for the difference between the four hundred and fifty acres and the number of acres actually in the farm. Defendant's brief states that there are 'about four hundred and twenty-seven acres,' while in complainant's brief the acreage is stated as four hundred and twenty-nine

and thirteen hundredths acres. The actual number of acres is not definitely stated in the testimony, but a survey offered in evidence shows the number of acres in the several tracts, which constitute the farm, the total of which I make to be four hundred and thirty-one and seventy hundredths, or eighteen and thirty hundredths less than defendant insists he should have.

"The rule is that where a vendor fraudulently represents the number of acres to be greater than the actual number and thereby induces the vendee to agree to pay more for the tract than he otherwise would, the vendee may refuse to perform the contract, or where there is no proof of fraud, but the difference between the actual and the estimated or represented quantity of land is so great as to clearly warrant the conclusion that a mistake has been made by the parties and that the vendee would not have contracted to pay so large a purchase price had he known the true facts, abatement of the purchase price will be made. *Melick* v. *Dayton*, *34 N. J. Eq. 245; Frenche* v. *Chancellor*, *51 N. J. Eq. 624; Straus* v. *Norris*, *78 N. J. Eq. 488; Hostetter* v. *Merrick*, *112 Atl. Rep. 487.*

"Complainant desired to sell his property, and learning that defendant was looking for a stud farm, called on defendant and offered to sell, stating to defendant that his farm contained in the neighborhood of four hundred and fifty acres and that he wanted $100 an acre for it. The following day complainant took defendant to see the property, and they spent at least five hours walking over and examining it. The farm was enclosed by line fences on all sides, save where it is bounded by the Pequest creek, and I believe complainant's testimony that he pointed out the fences to defendant and showed him the location of the creek. Defendant was favorably impressed with the farm because of its location and the fact that it was being utilized for and was adapted to the purpose he had in mind. He had been in the lumber business twenty-five years and had had a large experience in buying timber land. The parties thereafter had several interviews on the subject of the sale. Complainant insists that a price per acre was not mentioned after their first meeting, while defendant says that after seeing the farm he made complainant an offer of $80 per acre, which complainant

declined. At some meeting after the visit to the farm, defendant expressed a desire to purchase certain equipment and personal property thereon and complainant finally agreed to sell the farm and personal property for the lump sum of $40,000, making no statement as to the number of acres and specifying no price per acre. Defendant did not then accept the offer, but a few days later sent for complainant and stated that he had decided to buy at complainant's price and paid him $10,000 on account. Complainant then composed, wrote out and signed the receipt hereinabove set out and gave it to defendant, who read it and kept it. It will be observed that the receipt states that the farm contains '450 acres more or less.'

"Defendant does not claim that complainant fraudulently misrepresented the acreage or intended to mislead him in that respect. He claims to have relied on a definite statement made by complainant that there were four hundred and fifty acres in the farm. The use of the words 'more or less' in the receipt confirms complainant's testimony that at his first meeting with defendant he stated he owned 'in the neighborhood of 450 acres,' and indicated that he was not certain as to the exact number of acres but proposed to convey all he owned and the question, therefore, is: Was defendant willing to pay $40,000 for the land and premises as he saw it [including the personal property], understanding that he was to get about four hundred and fifty acres, perhaps less or perhaps more, and is the actual difference so considerable that a portion of the purchase price should be abated to defendant?

"I do not think defendant was influenced in the purchase by complainant's statement at their first meeting as to the area of the farm, whether complainant said it contained '450 acres' or 'in the neighborhood of 450 acres,' nor do I think that the purchase price as finally fixed was based upon a price per acre. Before agreeing to purchase, defendant had inspected the farm. Because of his experience in buying timber land he was able to estimate its area, and finding that the whole plant was suitable for his purposes, agreed to buy. After seeing the farm, the purchase of the personal property was discussed and the value of such personal property must have been considered by defendant

31

when he agreed on the purchase price. He does not say that had he known the farm contained less than four hundred and fifty acres he would not have bought it, or that he would not have offered so much as $40,000, and I conclude that the quantity of land was not of the essence of the contract, but that the defendant agreed to buy the property, real and personal, as an entirety without regard to the exact number of acres of land, unless the variance between what he thought was there and the actual contents should prove to be considerable. I cannot say that the difference is so great that it should not be included within the terms 'more or less.' According to my computation, the difference is four per cent., and according to defendant's brief, it is a little more than five per cent. In *Melick* v. *Dayton, supra,* a difference of four and one-half per cent. in the acreage was held insufficient to entitle a purchaser to an abatement in the purchase price. I think the difference here is insufficient to justify a deduction from the purchase price. Moreover, there is no evidence before me as to the value of the land which could be used as a basis for computing an abatement. Complainant's offer, which defendant accepted, was a lump sum of $40,000 for land, buildings and personal property, and it would be inequitable to allow an abatement at a rate per acre ascertained by dividing four hundred and fifty into $40,000.

"Defendant's final defence is that complainant made no tender of a proper deed prior to filing his bill of complaint on September 13th, 1918. A deed was tendered by complainant in June, 1918, which purported to convey the whole farm, but through a mistake of which neither party was then aware, did not contain a correct description of the seven-and-eighty-six-hundredths-acre tract. Defendant refused to accept it, but not because the description was incorrect or for the reason that there was a shortage in the acreage. His refusal was on the ground that the receipt did not specify a time for the payment of the balance of the purchase price and that complainant had agreed with him to wait until November 1st, 1918, for such balance. After this tender and refusal, defendant learned of the questionable title to the seven-and-eighty-six-hundredths-acre tract and he filed his answer herein November 2d, 1918, wherein

he set up that because of the defect in title and the shortage in acreage he would not perform his contract. This was the first notice to complainant that his title was questioned and that the description in the deed he had tendered defendant was defective. He thereupon notified defendant's solicitor in this cause that he was ready to deliver a deed containing a correct description, and upon being informed by such solicitor that defendant would not accept it and pay the balance of the purchase price, he filed a supplemental bill. Reading defendant's answer in this suit, it is apparent that had complainant before filing his bill tendered defendant a deed containing a proper description, defendant would have refused to accept it, and it is also apparent that a formal tender of such a deed by complainant before filing his supplemental bill would have been futile. What complainant did before filing his supplemental bill to evidence his willingness to perform his part of the contract was sufficient, and an empty show of formal tender and demand was unnecessary under the circumstances.

"Defendant has set up in his answer several offsets against the purchase price, concerning which I shall say without discussing them, that they should be determined in an action at law before a jury and that they will not be allowed defendant in this suit.

"I shall advise a decree directing defendant to accept a deed from complainant which shall contain a correct description of the farm to be conveyed, together with a bill of sale of the personal property, and further directing defendant to pay complainant $30,000, with interest, from November 1st, 1918. I allow interest from that day because there is a dispute between the parties as to the date upon which defendant agreed to take title, and on this point I accept defendant's version of the agreement."

*Mr. Thomas M. Kays,* for the respondent.

*Mr. William A. Dolan,* for the appellant.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Fielder.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WILLIAMS, GARDNER, ACKERSON, VAN BUSKIRK—13.

*For reversal*—None.