The prayer of the complainant's bill is that the defendant be decreed to specifically perform a contract in writing between the complainants, as vendors, and the defendant Lila W. King, as vendee, for the sale and purchase of property in the City of Asbury Park, New Jersey, known and designated as Lot No. 929 on a Map of Asbury Park made by F.H. Kennedy Son, A.D. 1874, and on which is located a hotel known as the Asbury Ambassador. The lot is located on the north side of Third Avenue between Kingsley and Bergh Streets. The contract is dated February 1st, 1947, and provides for a purchase price of $225,000, payable $10,000 upon the execution of the agreement, $40,000 upon settlement and delivery of deed, "on or before the 18th day of February" following, and the balance of $175,000 to be secured by a bond and purchase-money mortgage in that amount. The contract further provides that conveyance was to be made —
"SUBJECT to covenants, conditions and restrictions of record, which have not been violated.
"SUBJECT to state and municipal laws and requirements as to the use, location and constructions of the building and premises, which have not been violated.
"SUBJECT to such state of facts as may be disclosed by an accurate survey, provided said survey indicates that the buildings are all within the boundary lines.
"It is further understood and agreed that any and all alcoholic beverages and other merchandise, used in connection with the operation of the bar, on the premises, is to be paid for by the party of the second part at the cost of the said merchandise and said payments shall be made at the time of the passing of title, in addition to the purchase price.
"The parties of the first part agree, and it is of the essence of this agreement, that they will take all appropriate steps to effect a transfer to the party of the second part of the Retail Liquor Consumption License presently covering the ground floor of the premises herein described and issued to Asbury Park Ambassador Corp.; and the party of the second part agrees to do whatever may be necessary on her part to effect such a transfer; and in the event the transfer of said license is denied, then this agreement shall be null and void and the party of the second part shall be entitled forthwith to the return of any moneys paid by her under this contract. It is agreed that the closing of title shall not take place until the transfer of the license is approved by the appropriate municipal authorities." *Page 517 
The contract was not closed on February 18th because the transfer of the liquor license had not been accomplished and settlement was postponed until March 11th, on which date the City Council was to act upon the application for transfer of said license, and it was agreed that settlement would be made on the afternoon of that day after the meeting of the City Council. But settlement was not then made, as following the hearing before the City Council the attorney for the defendant vendee served a notice on the complainants' attorney demanding the return of the $10,000 deposit "for the reason that an examination of the title discloses covenants, conditions and restrictions of record which have been violated contrary to the provisions of the said agreement between us."
The bill of complaint was filed on March 19th, and Frank L. King, the defendant vendee's husband, was joined as a party defendant, the bill alleging that he was a necessary party. As he was not a party to the agreement of sale I do not consider him either a necessary or proper party, and the bill will be dismissed as to him.
The defendant vendee's defense to this bill is that complainants are unable to convey a good title in accordance with the terms of the agreement of sale, because of a restrictive covenant prohibiting the sale of intoxicating liquor on the premises; and this defendant counter-claims and demands the return of her down-money and the expenses of examination of title, c.
The defense resolves itself into the contention that by consummating the purchase of the property here involved the defendant vendee will be exposed to the hazard of litigation. Or, in other words, that she will be purchasing a law suit. Dobbs
v. Norcross, 24 N.J. Eq. 327. The law touching this question is, I think, well settled.
It is the uniform rule in this State to decline to decree specific performance where reasonable doubt concerning the title exists, though rested on grounds merely debatable, but which might visit upon the purchaser litigation in that regard, and that too, where at law, the title might in fact be declared good.Van Riper v. Wickersham, 77 N.J. Eq. 232; Saracino v.Kosower Construction Co., 102 N.J. Eq. 230. In the Van *Page 518 Riper Case the following cases are cited in support of the rule: Vreeland v. Blauvelt, 23 N.J. Eq. 483; Dobbs v.Norcross, supra; Tillotson v. Gesner, 33 N.J. Eq. 313;Cornell v. Andrews, 35 N.J. Eq. 7; Paulmier v. Howland,49 N.J. Eq. 364; Lippincott v. Wikoff, 54 N.J. Eq. 107; Day v.Kingsland, 57 N.J. Eq. 134. See, also, Doutney v. Lambie,78 N.J. Eq. 277; Simpson v. Klipstein, 89 N.J. Eq. 543; Richman
v. Standard Oil Co., 95 N.J. Eq. 745; Breitman v. Jaehnal,99 N.J. Eq. 243; affirmed, 100 N.J. Eq. 559; Barger v. Gery,64 N.J. Eq. 263; Zelman v. Kaufherr, 76 N.J. Eq. 52; ElmoreDevelopment Co. v. Binder, 97 N.J. Eq. 126; Sharpe v.Stretch, 98 N.J. Eq. 225; Sulk v. Tumulty, 77 N.J. Eq. 97;Deseumeur v. Rondel, 76 N.J. Eq. 394; Meyer v. Madreperla,68 N.J. Law 258; Franklin v. Creth, 97 N.J. Eq. 538; Potter v.Lumsden, 93 N.J. Eq. 476; Richards v. Knight, 64 N.J. Eq. 196;Commercial Trust Co. v. Zunni, 108 N.J. Eq. 435; affirmed,110 N.J. Eq. 569; Acquackanonk Building and Loan Association v.Parsonnet, 107 N.J. Eq. 48; Crane v. DeCamp, 21 N.J. Eq. 414;Vandermade v. Appert, 125 N.J. Eq. 366; Thorp v. Pettit,16 N.J. Eq. 488; Trenton Potteries Co. v. Blackwell, 137 N.J. Eq. 113; Bank of Montclair v. Mallas, 120 N.J. Eq. 611; Burke v.Dorfan, 101 N.J. Eq. 84; Pound v. Pleister, 106 N.J. Eq. 101;
affirmed, 107 N.J. Eq. 577; Smith v. Reidy, 92 N.J. Eq. 586;Trinity Cathedral v. Etz, 137 N.J. Eq. 261; Kohlrepp v. Ram,79 N.J. Eq. 386; Methodist Episcopal Church v. Roberson,68 N.J. Eq. 431; Propper v. Colson, 86 N.J. Eq. 399; Sheehan v.Humphreys, 81 N.J. Eq. 416; McKibbin v. Brown, 14 N.J. Eq. 13;
affirmed, 15 N.J. Eq. 498; Potter v. Hollister, 45 N.J. Eq. 508;
affirmed, 46 N.J. Eq. 609; Myers v. Metzger, 63 N.J. Eq. 779; Wilson v. Vogel, 87 N.J. Eq. 584. And there are numerous other cases in our reports to the same effect — most, if not all, of which I have examined. In Tillotson v. Gesner,supra, Mr. Justice Scudder, speaking for the Court of Errors and Appeals (at p. 327), said:
"The purchaser should have a title which shall enable him not only to hold his land, but to hold it in peace; and if he wishes to sell it, to be reasonably sure that no flaw or doubt *Page 519 
will come up to disturb its marketable value. The court cannot satisfactorily or conclusively settle a title in the absence of parties who are not before them in the suit to assert their estate or interest in the lands."
And in Dobbs v. Norcross, supra, Chancellor Runyon said that the court will never compel a purchaser to take a title where the point on which it depends is too doubtful to be settled without litigation, or where the purchase would expose him to the hazard of such proceedings.
In Barger v. Gery, supra (at pp. 267 and 268) Vice-Chancellor Stevenson quotes from Pomeroy on SpecificPerformance, § 203, where the text is as follows:
"A specific performance will never be decreed at the suit of the vendor whenever the doubt concerning his title is one which can only be settled by further litigation, or when the court can see that the purchaser will, with reasonable probability, be exposed to bona fide adverse claims on the part of third persons, and to the risk of litigation for the purpose of removing such claims." (Italics mine.)
Vice-Chancellor Stevenson further said that the doubts affecting a title might relate either to a matter of law or a question of fact; that the general trend of judicial opinion was toward settling doubtful questions of law in the suit for specific performance; but, that when the doubt related to a question of fact, the quantum of evidence necessary to establish the fact upon which the title is dependent must rest largely upon the circumstances of each particular case, and that the general rule is "that the purchaser has a right to a title which is reasonably safe — reasonably safe against loss and reasonably safe against attack."
And. "When the authorities speak of the hazard of litigation to which the purchaser must not be subjected * * * they must refer to a hazard which is to be determined by the chance of successful attack as viewed by the court in the suit for specific performance. When, also, they speak of a doubt or a supposed flaw as affecting the salability of a title, they must refer to the character of the doubt or flaw as the court views it, and not as it may be viewed by the indeterminate judgment of the real estate market. Some purchasers, guided *Page 520 
by cautious counsel, will not accept a title against which the slightest possibility of doubt is suggested; and yet there is no title concerning which a possible doubt or the possibility of a future flaw cannot be raised."
He then stated the rule which I think must be applied in the instant case, as follows:
"The authorities, I think, establish the rule as a safe one that a title dependent on a fact must be regarded as marketable when (1) the fact is so conclusively proved in the suit for specific performance that a verdict against the existence of the fact would not be allowed to stand in a court of law, and (2) where there is no reasonable ground for apprehending that the same fact cannot be, in like manner, proved, if necessary, at any time thereafter for the protection of the purchaser."
In Doutney v. Lambie, supra, the Court of Errors and Appeals refused to pass upon the correctness of that rule because it was unnecessary to invoke it in its entirety. But the rule was applied by Vice-Chancellor Fielder in Potter v. Lumsden,supra, where the Court of Errors and Appeals adopted his opinion. And in Pomeroy on Specific Performance (3d ed.) p.524, § 204 ¶ II, it is said that:
"Whatever be the cause from which the doubt arises, whether from an unsettled principle of the general law, or from the difficulty of construing instruments, or from past facts and events, it must be something more than a mere speculation, theory or possibility. A court of justice, in all its investigations, deals with arguments more or less based upon a balance of probabilities; and in rendering its decisions must be satisfied if it reaches a conclusion which is morally certain. To admit of objections which were purely speculative, or merepossibilities, would destroy the practical efficacy of all judicial proceedings. A doubt covering the vendor's title, therefore, which can avail to defeat his remedy of specific performance, must be reasonable, and so far as it depends upon contingent events and uncertain facts, their occurrence or existence must be fairly probable."
And in Fry on Specific Performance (6th ed.) p. 413 §882, it is said:
"It is by no means easy to express what amount of doubt upon a point there must be, to induce the court to refuse specific performance." *Page 521 
And at p. 419 § 891;
"It is conceived that the court would consider the title not to be doubtful * * * where the probability of litigation ensuing against the purchaser in respect of the doubt is not great, the court, to use Lord Hardwicke's language in one case, must govern itself by a moral certainty, for it is impossible in the nature of things, there should be a mathematical certainty of a good title.'" Citing Lyddall v. Weston, 2 Atk. 19.
And in Cattell v. Corrall, 4 Y. C. Ex. 228;160 Eng. Rep. 689, Alderson, B., said:
"There must be a reasonable, decent probability of litigation."
And in Gill v. Wells, 59 Md. 492, Miller, J., said:
"But a threat or even the possibility of a contest, will not be sufficient. The doubt must be considerable and rational, such as would or ought to induce a prudent man to pause and hesitate; and not based on captious, frivolous and astute niceties, but such as to produce real bona fide hesitation in the mind of the chancellor."
And in Hellreigel v. Manning, 97 N.Y. 56, it was said:
"A reasonable doubt is such as affects the value of the title, and would interfere with its sale to a reasonable purchaser and thus render the title unmarketable."
But all of these statements touching the character of the doubt which would excuse the vendee from his contract of purchase, are summed up in the statement "That the doubt must be a rationable doubt, or real and not fanciful." Methodist Episcopal Church v.Roberson, Zelman v. Kaufherr and Breitman v. Jaehnal,supra.
The validity of the defense here interposed must be tested by these rules.
What, then, is the doubt affecting the complainants' title and upon which the defense rests? And is that doubt "a rational doubt, real and not fanciful?" These are the questions which must be answered and upon the answers to which, it seems to me, my decision in this case must be based. But for an intelligent consideration of these questions some pertinent facts in addition to those already recited must now be stated and discussed. *Page 522 
The evidence shows that the lot here involved was formerly owned by James A. Bradley, who laid out and developed the City of Asbury Park, and by deed dated November 16th, 1875, was conveyed by him to George L. Atkins, subject to the following covenants and conditions:
"The said party of the second part, for himself, his heirs, executors, administrators and assigns, covenants that he and they shall never use said premises, or cause the same to be used for the sale of intoxicating liquors or for any manufacturing purpose whatever, and that no hog pens shall ever be erected thereon, and it is hereby mutually made a part of this sale, that any violation of the above conditions shall cause the title to revert to the said party of the first part."
A similar restrictive covenant was inserted in practically all of the deeds from Bradley, both prior and subsequent to the Atkins deed, for lots shown on this map, and which lie east of the railroad. The only exceptions are a few ("two or three") lots in the business district along Cookman Avenue and vicinity, but none north of Summerfield Avenue.
By mesne conveyances title to Lot No. 929, which is the lot here involved, was vested in the Park-Roosevelt Realty Co., Inc., and that corporation was the owner thereof on January 7th, 1944. On that date John H. Parker, Jr., substitutionary administrator,cum testamento annexo, and trustee under the last will and testament and codicils thereto of James A. Bradley, deceased, executed to Park-Roosevelt Realty Co., Inc., a deed of release, reciting the conveyance from Bradley to Atkins and the conditions and restrictions contained in said deed, among which was the one above recited; particularly describing said Lot 929; reciting a request by the then owner thereof for a release of all the estate, right, title and interest, vested or contingent, of James A. Bradley, for or by reason of the above-recited conditions, and an agreement on the part of the Park-Roosevelt Realty Co., Inc., as consideration for said release "to enter into and substitute in the place and stead of said conditions, certain covenants hereinafter set forth, the same to be covenants running with the land." The deed of release then provided as follows:
"NOW THEREFORE THIS INDENTURE WITNESSETH: That the said party of the first part, favoring the said request, and by virtue of the said power and authority to him given in and by the last will and *Page 523 
testament and codicils thereto, and for and in consideration of the covenants herein contained and entered into by the said party of the second part, and of One Dollar, lawful money of the United States of America, to him in hand paid by the said party of the second part, at and before the sealing and delivery of these presents, does remise, release and forever quit claim unto the said PARK ROOSEVELT REALTY COMPANY, INC., its successors and assigns, all the aforesaid lot or parcel of and hereinabove mentioned and described, and now owned by its as aforesaid, with the appurtenances, to have and to hold the said lot or parcel of land freed and discharge (d) of and from all right of entry for condition broken, right of action, reversion of forefeiture or otherwise, which the said James A. Bradley at the time of his death, or which the said party of the first part now has or might or could have in or to the said lot or parcel of land hereinabove described, for or by reason of the hereinabove recited conditions contained in the above mentioned deed of conveyance from the said James A. Bradley and wife, to the said George L. Atkins, under which the said PARK-ROOSEVELT REALTY COMPANY INC. holds title to the said lot or parcel of land hereinabove mentioned and described, or for, or by reason of any violation of the said conditions.
"AND the said party of the second part, for and in consideration of the foregoing release and of One Dollar, lawful money of the United States of America, to it in hand paid by the said party of the first part, at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, does hereby covenant and agree to and with the said John H. Parker, Jr. Substitutionary Administrator C.T.A. and Trustee under the last will and testament and codicils thereto of James A. Bradley, deceased his heirs, legal representatives and assigns, that it, the said party of the second part, its successors and assigns, shall not, nor will cause or procure, permit or suffer any house, cottage or other building to be erected thereon nearer the line of said Third Avenue than 24 feet, and also that the maximum grade of said lot shall not exceed 4 feet above the level of the sidewalk in front of same. The said party of the second part for itself, its successors and assigns covenants that it shall never use said premises or cause the same to be used for sale of intoxicating liquors or for any manufacturing purpose whatever, and that no hog pens shall ever be erected thereon.
"It is hereby expressly agreed that in case the restrictions or any of them provided for in the above covenants have been abandoned by non-observance, by change in the character of the neighborhood, by agreement, or otherwise, then nothing herein shall be construed as a revival of any restriction which has been abandoned by non-observance, by change in the character of the neighborhood, by agreement or otherwise, and the covenant herein in respect to such restriction, as may have been abandoned by non-observance, by change in the character of the neighborhood, by agreement or otherwise, shall be for nothing holden.
"And it is expressly understood and agreed that the said several covenants on the part of the said party of the second part above *Page 524 
specified shall attach to and run with the land and it shall be lawful not only for the said John H. Parker, Jr. Substitutionary Administrator and Trustee as aforesaid, his heirs, legal representatives, successors in office and assigns, but also for the owner or owners of any lot or lots of land adjoining or in the neighborhood of the premises hereby released, deriving or having derived title from or through the said John H. Parker, Jr. Substitutionary Administrators and Trustees as aforesaid, or his predecessors in office, or from or through the said testator, to institute and prosecute any proceedings at law or in equity against the person or persons violating or threatening to violate the same, it being understood, however, that this covenant is not to be enforced personally for damages against the said Party of the second part its successors and assigns, unless it be the owner or owners of the said premises, or of some part at the time of the violation thereof, but the said covenants may be proceeded on for an injunction of, and for a specific performance and execution thereof against the said party of the second part, its successors and assigns, and for damages against the said party or parties violating the said covenants, his or their administrators or assigns."
While the bill seeks the specific performance of a contract dated February 1st, 1947, the transaction here involved will be better understood if it is noted that the original contract between these parties was executed on November 26th, 1946. That contract is an exact duplicate of the one the subject of this suit, except for the provisions for the down payment and date of settlement. It provides for the payment of $5,000 upon its execution, which was then paid; a further payment of $5,000 on January 6th, 1947, and settlement thereunder on February 1st; and the other terms and conditions of the contract were identical with the contract of February 1st, 1947. On November 26th, 1946, the title to the property was in a corporation owned and controlled by the vendors, and it was considered to be more advantageous to them to have the corporation dissolved and title vested in the complainants individually before consummating the sale. Hence, the final contract of February 1st, 1947.
The November 26th contract, which was offered in evidence, shows on its face that the phrase "which have not been violated," as contained in the first and second "Subject" paragraphs, and the phrase "provided said survey indicates that the buildings are all within the boundary lines," as contained in the third"Subject" paragraph, and the paragraph providing *Page 525 
for the transfer of the retail liquor license to the vendee and making such transfer "of the essence," were added to the contract after it was originally prepared by Judge Levinson, acting on behalf of the complainants, but before its execution. This point is in dispute but I accept the testimony of Judge Levinson and am convinced that Mr. Weitzman, who at that time represented the defendant vendee, is mistaken in his version of what then occurred. The facts touching the preparation of the November 26th contract, as I find them, show that it was prepared by Judge Levinson in his office in Asbury Park and sent to Mr. Weitzman, who represented the vendee, at Newark some time before November 26th. On that date the parties with their attorneys appeared at Judge Levinson's office, Mr. Weitzman bringing the contract with him. When that document left Judge Levinson's office it did not contain the controversial phrase; but when Mr. Weitzman brought it back on November 26th, that phrase had been inserted. Also, the other quoted phrases in the two other "Subject" clauses, and the paragraph providing for the transfer of the liquor license had been inserted. A casual glance at this document will show that these insertions had been made on a typewriting machine other than the one on which the document had originally been written, and the periods at the end of the "Subject" clauses had been changed to commas. This is too plain to permit of any argument. Judge Levinson said he had but one typewriting machine in his office and his statement was not challenged. This circumstance, in my judgment, supports the judge's testimony and indicates that Mr. Weitzman is mistaken. There was corroborating testimony on both sides of this disputed question of fact, but I accept the testimony of complainants' witnesses as to what occurred and conclude that the defendant's witnesses failed to accurately distinguish between what occurred on that date and on February 1st when the new contract was executed.
The complainants contend that the phrase "which have not been violated" should be construed to read "which have not already
been violated," and I think, in view of all the circumstances, it is susceptible of that construction. It is unreasonable to assume that astute counsel representing the complainants *Page 526 
would have permitted them to sign an agreement of sale containing that provision if it meant anything else, for he knew that the Bradley restriction prohibiting the sale of liquor had been violated, not only by his clients but generally throughout the city since 1933, and that the violation on this particular property had continued since April, 1944. The Parker release of the reversion was executed on January 7th, 1944, and the inference is justifiable that it was so executed in anticipation of the license obtained for these premises in the following April. On the other hand, the defendant contends that the phrase was intended as a warranty that none of the Bradley restrictions, including that against the sale of intoxicating liquor, had been violated by the complainants or their predecessors in title. Ordinarily, the language of the phrase would be literally construed, but in view of the conduct of the parties I think such a construction was never intended. However, I need not determine its proper construction for, although I feel certain it was never intended as a warranty that the liquor restriction had not been violated, other facts and circumstances convince me that, if it was so intended by the vendee, she must be held to have waived it.
From the evidence I must conclude that the defendant and her counsel were fully aware when the original contract of November 26th was executed, and also when the second contract, specific performance of which is here sought, was executed, that this restriction had been violated by the vendors and that such violations throughout the City of Asbury Park was general. The abstract (Exhibit C-2) which recited the restrictive covenants in full was not only exhibited to counsel for defendant on November 26th, but was delivered to him and was in his possession continuously thereafter until the final hearing in this cause. But conceding, for the purposes of argument, that the abstract of title was not delivered to Mr. Weitzman until February 1st, the date on which the final contract was executed, as he claims, he then had before him the full facts touching the restrictions, the release of the reverter and the provision in the release that the imposition of certain restrictions as covenants running with the land should not revive any such restrictive covenants as had already *Page 527 
been abandoned. Thereafter he had over a month to consider the question of abandonment of the liquor restriction, and with the knowledge that liquor had been sold in the hotel for two and one-half years, proceeded with the application for transfer of the liquor license. As to his knowledge of the existence of this restriction I have not the slightest doubt, and the insertion of the last paragraph on the first page of the contract, making the sale contingent upon the transfer of the liquor license then in effect to the defendant purchaser, is a clear indication that she would not have been interested in the purchase of the property if that restriction had not been violated. The vendee knew, or her counsel knew, that she would not be bound by restrictions which were no longer in force, and it is clear that the parties considered this particular restriction as no longer effective. Having had the abstract in his possession for over two months before the contract of February 1st was executed, and knowing of the existence of the restriction when this contract was signed, I consider the payment at that time of an additional $5,000 on account of the purchase price to constitute a waiver of the complainants' violation of the restriction as a defense to this action.
But it seems to me that there was both a waiver and an estoppel. Aside from the fact that, as I think, no warranty that the restriction against the sale of intoxicating liquor had not been violated was ever intended, the defendant vendee's conduct was such as to lead the complainants to believe that the sale of liquor on the premises was considered by her as an advantage rather than a burden. In fact, the continued violation of this restrictive covenant was a condition of the contract imposed by her. It was not until after February 28th, 1947, when the defendants' attorney received notice that the application for a transfer of the license would be acted upon by the City Council of Asbury Park on March 11th, and, if approved, the closing of title would take place that afternoon, that any serious concern over this restriction was evidenced by the defendants' attorney. To be exact, on March 10th, the day before the date fixed for settlement, although he claims that some ten days previous to February 28th he had *Page 528 
expressed some doubts about assuming the risks of the restrictions. But nowhere in the correspondence between or among the several lawyers concerned in the transaction, was there ever a word of objection or concern over this restriction; and even after the receipt of Mr. Casriel's letter on February 28th, in which it was stated that the defendant vendee herself had said she wanted to close title on the afternoon of March 11th if the license transfer was approved, the proceedings for the transfer of the license were continued and actively participated in by the defendant and her attorney right up to the final hearing before the City Council on that date. At that hearing Mr. Weitzman, then the defendant's attorney, spoke in favor of the transfer. After leaving council chambers the parties went out to lunch together and then down to Judge Levinson's office, ostensibly for the purpose of closing title; but shortly after their arrival, Mr. Weitzman served a notice of demand for the return of the $10,000 deposited on account of the purchase price, and refused on behalf of his client to take title. This notice admittedly had been prepared on the day previous, and Mr. Weitzman had it in his pocket during the hearing before the City Council and during lunch, and until it was served. This fact showed an intention on the defendant vendee's part to repudiate the contract notwithstanding which she, by her active conduct in furtherance of the transfer of the license, led the complainants to believe that the covenant against the sale of liquor was not objectionable to her and that she intended to complete her purchase. It is claimed that her participation in these proceedings on March 11th was due to her agreement to do whatever was necessary to effect such transfer. But if she had already decided to repudiate the contract, and it is evident that she had, it was "love's labor lost" to continue the transfer proceedings.
On March 10th when Judge Levinson and Mr. Casriel were in Mr. Weitzman's office discussing this liquor restriction, Mr. Weitzman informed them that a title company had refused to insure against injunction proceedings for violation of the liquor restrictions, and negotiations were opened with another title company; but they were ended by the defendant's demand for the return of the deposit. No opportunity was *Page 529 
afforded the complainants to obtain such a policy for the defendant. Of course, there was no obligation on the complainants to do so — the sale was not subject to any such contingency — but their attorneys were willing to cooperate.
At the conference in Mr. Weitzman's office on March 10th, when this restriction was being discussed, Mr. Casriel said to him, "Sam, we are discussing a lot here and beating around the bush. If you really want this property — if you people really want this property I am sure whatever question you may have can be resolved, but if you want out, why we are just wasting a lot of time, so you might as well tell us." To this Mr. Weitzman replied, "Well, if we had to take it we would have to take it, but we want out." This conversation, taken together with the fact that on that very day Mr. Weitzman prepared the demand for the return of the deposit, shows pretty clearly that the defendant had decided to get out of the contract if possible. In Mr. Casreil's letter of February 26th he said, "I have this day prepared and sent to Mr. and Mrs. Frederick a notice termination their license regarding the kitchen and dining room of the hotel. I imagine they will communicate with you about the matter." The agreement of sale specifically provides that "The present agreement concerning the operation of the dining room and kitchen of the hotel shall be disavowed or accepted by the purchasers by the closing date." It was because of this provision that Mr. Casriel advised the defendant vendee's attorney of the termination of the agreement. At this time Mr. Weitzman had given no indication of his client's desire to avoid her contract. The whole attitude and conduct of the defendant vendee and her counsel, from November 26th, 1946, to March 10th, 1947, was such as to lead the complainants to believe that she has no objection to the restrictive covenant now invoked as an excuse for non-performance of the contract, and, in my judgment, constitutes a waiver of such restriction and an estoppel against any possible right of rescission. Schwoebel v. Storrie, 76 N.J. Eq. 466.
In that case Vice-Chancellor Leaming (at p. 470), said:
"Where a person purchases property where a visible state of things exists which could not legally exist without the *Page 530 
property being subject to some burden, he is taken to have notice of the extent and nature of the burden."
The statement is applicable here whether the "state of things" (the sale of liquor) was legal or illegal. Obviously it was not considered a "burden" when the contract was made for without that "burden" the defendant vendee did not want the property.
As was said in Aron v. Rialto Realty Co., Inc., 100 N.J. Eq. 513;
affirmed, 102 N.J. Eq. 331:
"It is quite apparent that the [liquor] restriction was finally seized upon as an excuse and not as a reason for non-performance."
Although I am of the opinion that the defendant vendee is barred by both waiver and estoppel from interposing her pleaded defense, I shall now consider the doubt concerning the effect of this liquor restriction on complainants' title. Is it rational, reasonable and not fanciful? I believe this involves a mixed question of law and fact.
The agreement of sale does not provide for a conveyance free from all encumbrances except those mentioned in the "Subject"
clauses. It provides for a conveyance by a deed of warranty "subject to covenants, conditions and restrictions of record, which have not been violated," and subject to the other clauses already quoted; but in every contract for the sale of lands, there is an implied agreement on the part of the vendor to make good title for the lands to the vendee. Lounsbery v. Locander,25 N.J. Eq. 554.
The defendant vendee claims that although by the deed from John H. Parker, Jr., substitutionary administrator, cum testamentoannexo, and trustee, c., Bradley's right of reversion was released, the restriction against the sale of intoxicating liquors on this lot is more effective now than before, because the restriction is there re-imposed in the form of a covenant running with the land; and, that because the complainants or their predecessors in title have been selling intoxicating liquor in the hotel located on this lot since 1944, this covenant has been violated and that, therefore, the complainants cannot convey a title in accordance with the agreement of sale because that agreement provided that the vendee *Page 531 
should take subject only to the conditions and restrictions of record, which have not been violated. On the other hand, the complainants contend that at the time this deed of release was executed and at the time of the execution of the agreement, specific performance of which is here sought, the restriction against the sale of intoxicating liquor imposed by Bradley generally throughout the City of Asbury Park, had been abandoned; that such abandonment had been acquiesced in by the public generally; that, by the express terms of the Parker deed, the restriction was not revived; that, therefore, the restriction is no longer in force; that the phrase, "which have not been violated," as contained in the quoted "Subject" clause, did not have reference to the restriction against the sale of intoxicating liquor and that it was so understood at the time the contract was executed.
Obviously, the only source of attack on this title by reason of this covenant is in other lot owners, grantees of Bradley or their successors in title. And if the covenant has been abandoned and such abandonment acquiesced in by them, or if it has become ineffective for any other reason, the danger of attack from this source is fanciful and not real. Bowen v. Smith, 76 N.J. Eq. 456; Page v. Murray, 46 N.J. Eq. 325; Chelsea Land andImprovement Co. v. Adams, 71 N.J. Eq. 771; Sanford v. Keer,80 N.J. Eq. 240; Ocean City Land Co. v. Weber, 83 N.J. Eq. 476;Fisher v. T.W. Griffith Realty Co., 88 N.J. Eq. 204; Dettsloff
v. Hockstetter, 96 N.J. Eq. 391; Ocean City Association v.Chalfant, 65 N.J. Eq. 156.
Looking at the situation which might possibly arise in the future, it is clear that if a suit were brought in this court for an injunction, the defense of estoppel could be invoked and would undoubtedly prevail. These premises have been used for the sale of intoxicating liquor for approximately four years. That fact has been notorious in the community. When the first application for a liquor license was made in 1944 a large number of property owners filed written objections with the City Council. Only one of these objectors mentioned the restriction against the sale of liquor, and she stated that, "my deed to the Hotel Keswick at 209 Third Avenue states *Page 532 
definitely that no intoxicating liquors may be sold in that block." (The Hotel Keswick is several blocks distant from the Asbury Ambassador.) The City Council denied the application, but on appeal to Alcoholic Beverage Commissioner (now Governor) Driscoll, the license was granted and has been in force continuously since April or May of 1944. When the application for a transfer of the license to the defendant was made in 1947, there were objections filed with the City Council, but these objections were comparatively few in number and none of them were based upon the existence of the restrictive covenant. Considerable notoriety attended both the original application and the application for transfer, notwithstanding which no effort to enforce the restriction has ever been made. Prior to 1933, when the federal constitutional prohibition amendment was repealed, the sale of liquor in Asbury Park was illegal for reasons other than the restrictive covenant; but during the past fifteen years since the repeal of that amendment, 81 liquor licenses, 63 of which are east of the railroad tracks, have been granted in the City of Asbury Park and are now in operation. One of these is within one block, three within two blocks, and eight within three blocks of the Ambassador Hotel. The Berkeley-Carteret Hotel and the Hotel Monterey are within four and five blocks respectively. In the area east of Bergh Street and between Asbury and Fourth Avenues, comprising ten blocks, there are 11 liquor licenses in seven of those blocks, all except two antedating the Ambassador license and some of them having been in continuous operation since 1933. The Berkeley-Carteret license was granted in 1933 and the Monterey Hotel license in 1934, and they have been in force continuously except for two or three years during World War II when those hotels were occupied by the military or naval forces. The lots on which all these licensed places are located were conveyed by Bradley subject to the same restrictive covenant prohibiting the sale of intoxicating liquor as that involved here.
It should be noted that Third Avenue between Bergh and Kingsley Streets, in which block the Asbury Ambassador Hotel is located, is occupied entirely by hotels except for one building at the corner of Bergh Street and Third Avenue, *Page 533 
which is a large rooming house. The practice of granting liquor licenses to hotels in Asbury Park has been so general that it would be inequitable to deny such a license to the Asbury Ambassador (Page v. Murray, Bowen v. Smith, and Ocean CityAssociation v. Chalfant, supra) and that was evidently the opinion of the Alcoholic Beverage Commissioner and City Council, to whose judgment and discretion the troublesome question of the number and location of liquor licenses may, as I think, be safely left.
So far as appears from the evidence, but one objection has been made to the granting of any of these licenses on the ground that they were in violation of the covenant, and that objection, interposed in 1944, to the granting of a license for the hotel here in controversy, was not mentioned anywhere in the minutes of the council or the conclusions of the Alcoholic Beverage Commissioner. It does appear, however, that at the hearing before the Commissioner all of the objectors who appeared thereat withdrew their objections in view of the applicant's willingness to accept the restricted license which was thereafter issued. As I see it, the attitude of the whole community since 1933 has been one of acquiescence in the apparent abandonment of the restrictive covenant. It is too late now, in my judgment, to attempt to revive it, at least so far as the property here involved is concerned. Diligence in the enforcement of a restrictive covenant is required not only of the covenantee, but also of his grantees. If conduct ever worked an estoppel, I think it has done so here; and the hazard of litigation designed to enforce this restriction against this hotel property is negligible. Of course, some ill-advised person might attempt to do so, but "when the authorities speak of the hazard of litigation to which the purchaser must not be subjected * * * they must refer to a hazard which is to be determined by the chance of successful attack as viewed by the court in the suit for specific performance." Per Stevenson, V.C., in Barger v.Gery, supra. (Italics mine.) And as Backes, V.C., aptly said inSalter v. Beatty, 101 N.J. Eq. 86, "The remote possibility of an idle and vain suit is not within the category of being `exposed to the hazard of litigation' * * *." *Page 534 
The doubt affecting a title which may constitute a defense in a suit for specific performance, must be reasonable and the feared contingency (here a suit for injunction) must be fairly probable. Also, it must appear that the anticipated attack on the title will have some reasonable chance of success. Certainly it cannot be said that there is any reasonable chance of a successful attack on the title here involved based upon the violation of this covenant. I have no hesitation in saying that if such a bill came before this court, it is morally certain that the same would be dismissed, for the evidence to show an estoppel of other lot owners is contained in the official records of the city, and the proof of abandonment will undoubtedly multiply with the years and will be as available in the future as it is now.
Lister v. Vogel, 110 N.J. Eq. 35, is cited by counsel for defendants as authority for the contention that other lot owners, grantees of Bradley, or their successors in title, may enforce the covenant here involved against the vendee if she takes title. That case was decided by me and affirmed by the Court of Errors and Appeals on my opinion. It has no application here. It stands for the proposition that those lot owners for whose benefit a covenant is imposed may bring suit to enforce it. That familiar rule of law is not in dispute. There the covenant which provided for a twenty-five foot building set-back on Third Avenue and a ten foot set-back on Main Street, was enforced by a mandatory decree, but the release or quit-claim deed there involved differed materially from that sub judice. That release did not contain the paragraph of the Parker release touching abandonment and revival which is quoted above, and the questions of abandonment, waiver and estoppel were not involved.
I have not overlooked the fact that whatever decree is entered in this cause will be in personam and not in rem, and, therefore, not binding on persons not parties to this suit, but the possibility that any person not such a party will attempt to enforce this restrictive covenant against the property the subject of this suit is so remote that the unbinding character of the decree seems to me to be of no moment here.
Counsel for the defendants questions the validity and effectiveness *Page 535 
of the Parker release, which he characterizes as a quit-claim deed, both for that reason and because of the expressed nominal consideration of "one dollar." These questions were not raised in the pleadings or at the trial, and there is no evidence to indicate that a complete conveyance of the grantor's interest was not made or an effective release accomplished. In8 R.C.L. 1025, it is said that: "The modern rule may be said to be that a quit-claim deed is as effective to convey land as any other conveyance."
The text was cited and quoted with approval by Mr. Justice Lloyd, speaking for the Court of Errors and Appeals in Baum v.Canter, 104 N.J. Eq. 224, and counsel evidently overlooked the fact that there was other than nominal consideration expressed in the deed of release, to wit:
An agreement "as the consideration for the release to enter into and substitute in the place and stead of said conditions, certain covenants hereinafter set forth, the same to be covenants running with the land;"
And, "For and in consideration of the covenants herein contained and entered into by the said party of the second part, and of One Dollar," c.
Ample consideration for the release is expressed therein, and the release is effective for its purpose.
It is objected also that the title which the complainants offer is not marketable, but only because of the liquor restriction which has been violated. But the evidence indicates that such restriction and its violation have proved no obstacle to the sale of other properties in Asbury Park which were similarly situated. This evidence was furnished by the defendant's own witness. And, apparently, the marketability of this hotel is enhanced by the fact that it has a liquor license.
I will advise a decree for the complainants. *Page 536